**In re GABAPENTIN PATENT LITIGATION**

**Pfizer Inc., Warner–Lambert Company and Gödecke Aktiengesellschaft, Plaintiffs,**

v.

**Purepac Pharmaceutical Co. and Faulding Inc., Defendants.**

**No. MDL NO. 1384(JCL).**
**No. CIV.A.00–2931(JCL).**

United States District Court,
D. New Jersey.

Aug. 25, 2005.

154

David S. Copeland, Leora Ben–Ami, Stephen J. Elliott, Kaye Scholer, New York City, John J. Francis, Jr., Drinker Biddle & Reath, Florham Park, NJ, for Plaintiffs.

Arnold B. Calmann, Saiber, Schlesinger, Satz & Goldstein, LLC, Newark, NJ, Patrick J. Hughes, Connell Foley, LLP, Roseland, NJ, for Defendants.

## MEMORANDUM AND ORDER

LIFLAND, District Judge.

Plaintiffs Pfizer, Inc., Warner–Lambert Co., and Gödecke Aktiengesellschaft (collectively, "Warner–Lambert") brought suit against Defendants Purepac Pharmaceutical Co. and Faulding Inc. (collectively, "Purepac") alleging infringement of U.S. Patent No. 6,054,482, entitled "Lactam–Free Amino Acids" ("'482 patent").[1]

---

1. Warner–Lambert filed separate patent infringement actions against multiple generic drug manufacturers. The Judicial Panel on Multidistrict Litigation directed that all such actions be consolidated before this Court for coordinated pretrial proceedings. This Mo-

Purepac moves for summary judgment of noninfringement. For the reasons set forth herein, Purepac's motion will be denied.

## BACKGROUND

Neurontin® is sold by Warner–Lambert as an aid in the treatment of epileptic seizures and other cerebral disorders. The active ingredient in Neurontin® is a chemical compound called gabapentin. The chemical makeup of gabapentin allows the molecule, under certain conditions, to undergo an internal chemical reaction that results in a new compound called "gabapentin lactam." Gabapentin lactam, which is more than twenty-five times as toxic as gabapentin, actually causes rather than prevents seizures. Given the serious risks posed by gabapentin lactam, Warner–Lambert scientists sought to minimize its formation. They did so by way of a process ultimately disclosed in the '482 patent.

### A. Development of Neurontin

Warner–Lambert scientists discovered that a stable formulation of gabapentin required careful limiting in two areas. First, it was critically important to ensure that the gabapentin itself was relatively pure. Second, the nature and amount of other additives in a gabapentin formulation affected stability. The former is pertinent to this Motion.

When making a drug to market commercially, pharmaceutical companies generally prefer to use a "salt" of a drug in order to promote good stability and solubility, and to ensure that it is not irritating at the site of administration. A "salt" is

formed as a result of the reaction between an acid and a base wherein a hydrogen ion from the acid is transferred to the base. Drugs that are "basic," like gabapentin, form a salt with hydrochloric acid (HCl). Upon discovering that the hydrochloride salt of gabapentin turned to lactam more quickly than gabapentin itself, Warner–Lambert scientists turned their attention from using the hydrochloride salt to using "free" gabapentin.

Gabapentin hydrochloride salt can be converted back to the neutral form of gabapentin through a process called ion exchange. Ion exchange involves a solution of gabapentin hydrochloride in water being passed through a column of ion exchange resin prepared in the "basic" form. (Bartlett Decl. ¶ 15). The hydrochloric acid (HCl) stays on the column while the neutral form of gabapentin comes out the bottom. (*Id.*). Removal of HCl from gabapentin hydrochloride salt via ion exchange is a very efficient process. In a sample that has been prepared from gabapentin hydrochloride by ion exchange, there is a one-to-one correspondence between the number of chloride ions and the number of gabapentin molecules that remain in the acidic form. (Bartlett Decl. ¶ 17).[2]

### B. The '482 Patent

The '482 patent includes eleven claims—three independent claims (1,3,7) and eight dependent claims. Every claim in the '482 patent includes the limitation that gabapentin have "less than 20 ppm" of an anion of a mineral acid or that an anion of a mineral acid does "not exceed 20 ppm."

---

tion pertains to one of the "first-wave" defendants. There are also "second-wave" and "third-wave" defendants, sued by Warner–Lambert after close of discovery for first-wave defendants.

2. This background section is included for informational purposes and because the Court believes that it informs Warner–Lambert's position. The Court is mindful that Purepac disputes and/or challenges this information as irrelevant to the claim construction inquiry.

An anion is a negatively charged ion. Mineral acids include nitric, sulfuric, and hydrochloric acids. An anion of hydrochloric acid, for example, is chloride.

Claims 1 through 6 of the '482 patent are process claims. ('482 patent, col. 6, l. 55 to col. 8, l. 28). Independent claim 1 concerns a process for making gabapentin. Claim 1 specifies that the gabapentin compound resulting from the process must contain "less than 20 ppm" of an anion of a mineral acid. ('482 patent, col. 6, ll. 56–67; col. 7, ll. 1–20). Claim 2 depends from claim 1 and, accordingly, includes the "less than 20 ppm" limitation. (*Id.* at col. 7, ll. 21–22). Claim 3, the next independent claim, concerns a process for making a pharmaceutical composition containing gabapentin. Claim 3 specifies that the anion of a mineral acid remaining in the gabapentin compound produced during the process must "not exceed 20 ppm." (*Id.* at col. 7, ll. 23–57; col. 8, ll. 1–16). Claims 4, 5, and 6 depend from claim 3 and, therefore, include the "not exceed 20 ppm" limitation.

Claim 7 of the '482 patent, the only independent product claim, covers a pharmaceutical composition containing gabapentin:

7. A stable and pure pharmaceutical composition in unit dry medicinal dosage form consisting essentially of:

(i) an active ingredient which is gabapentin in the free amino acid, crystalline anhydrous form containing less than 0.5% by weight of its corresponding lactam and *less than 20 ppm of an anion of a mineral acid* and

(ii) one or more pharmaceutically acceptable adjuvants that do not promote conversion of more than 0.2% by weight of the gabapentin to its corresponding lactam form when stored at 25 C and an atmospheric humidity of 50% for one year.

(*Id.* at col. 8, ll. 29–40 (emphasis added)). Claims 8–11 depend from claim 7 and, therefore, incorporate all the limitations of claim 7, including the "less than 20 ppm" limitation.

The written description of the '482 patent states that "[t]he proportion of remaining hydrochloride admixtures should thereby not exceed 20 ppm. The same also applies to other mineral acids." (*Id.* at col. 5, ll. 27–29).

## C. The '482 Patent Prosecution History

The Gödecke scientists applied for a German patent on their discovery in August 1989. They filed a corresponding United States patent application in August 1990. The grant of the '482 patent, on April 25, 2000, came after a series of continuation United States patent applications and multiple reviews by the patent examiner.

None of the claims as originally filed included the "less than 20 ppm" or "not exceed 20 ppm" limitation. Claim 8 in the application became patent claim 1. Application claim 8 did not initially include the "less than 20 ppm" limitation. Only after the patent examiner rejected claim 8 as being unpatentable due to the prior art did Warner–Lambert insert the "less than 20 ppm" limitation into claim 8.

Application claim 10 became patent claim 3. Claim 10 initially specified that "the proportion of remaining mineral acid admixtures does not exceed 20 ppm." The examiner rejected claim 10 as being unpatentable due to prior art and for failing to satisfy the definiteness requirement for patentability. Among other things, the examiner believed that the language "the proportion of remaining mineral acid admixtures does not exceed 20 ppm" was ambiguous. Ultimately, Warner–Lambert

amended application claim 10 to state that "the proportion of remaining anion of a mineral acid does not exceed 20 ppm."

Application claim 5 provided the foundation for patent claim 7. During prosecution, Warner–Lambert canceled claim 5 and replaced it with claim 21, and subsequently canceled claim 21 and replaced it with claim 24. Application claim 24 issued as patent claim 7. Pharmaceutical claim 5 referred to and incorporated compound claim 1. The examiner rejected claims 1 and 5 as being unpatentable due to the prior art. Warner–Lambert amended claims 1 and 5 in response to those rejections. When claim 21 replaced claim 5, it contained the "less than 20 ppm" limitation. And when claim 24 replaced claim 21, it too contained the "less than 20 ppm" limitation.

D. *Purepac's Gabapentin Formulations*

On March 30, 1998, Purepac filed Abbreviated New Drug Application ("ANDA") No. 75–350 with the Food and Drug Administration ("FDA") seeking approval to sell gabapentin capsules for treating epilepsy. That ANDA covered capsules in strengths of 100 mg, 300 mg, and 400 mg. On September 3, 1999, Purepac filed ANDA No. 75–694 seeking approval to market gabapentin tablets for treating epilepsy. That ANDA covers tablets in strengths of 600 mg and 800 mg.

Purepac's ANDAs, as amended, include a specification for chloride requiring Purepac's capsules and tablets to contain gabapentin with a chloride level of between 28 ppm and 100 ppm.

### STANDARD OF REVIEW

Summary judgment is a procedural tool that obviates the need for trial by identifying and disposing of groundless claims and defenses. *Celotex Corp. v. Catrett,* 477 U.S.

317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Relief is warranted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). To resist, the adverse party must set forth specific facts that demonstrate the existence of a genuine issue for trial and may not rest on bare allegations or unsubstantiated defenses. Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Once the proponent discharges its Rule 56(c) duty, the burden shifts to the adverse party to show that material facts are genuinely controverted. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Materiality and genuineness are the touchstones of summary judgment law. A dispute is genuine only if the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. To determine whether the proofs create a jury question, the Court must take into account the apposite evidentiary burden. *Anderson,* 477 U.S. at 254–55, 106 S.Ct. 2505. If the proofs presented would permit a jury applying the governing evidentiary standard to find for the adverse party, then a genuine factual dispute exists. *Id.* at 255, 106 S.Ct. 2505. Whether those disputed facts are material depends on the applicable substantive law. *Id.*

Because summary judgment involves a pretrial adjudication on the merits, the adverse party enjoys the benefit of various procedural protections. For example, the Court must view the evidence in the light most favorable to the adverse party and accord that party the benefit of all legitimate inferences. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. Moreover, the Court may not take credibility issues from the fact-finder. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

"Summary judgment is as appropriate in a patent case as it is in any other case." *C.R. Bard, Inc. v. Advanced Cardiovascular, Inc.,* 911 F.2d 670, 672 (Fed.Cir.1990). Where the material facts regarding the contents of the accused product are not in dispute, "the question of whether [the accused product] literally infringes the asserted claim of the . . . patent turns on the interpretation of those claims," which is purely a legal question for the court amenable to summary judgment. *K–2 Corp. v. Salomon S.A.,* 191 F.3d 1356, 1362 (Fed. Cir.1999) (citing *Athletic Alternatives, Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573, 1578 (Fed.Cir.1996)).

### ANALYSIS

#### A. *Literal Infringement*

██ Literal infringement is determined in a two-step process. First, a court must determine a claim's acquired meaning and scope. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir.1995) (in banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Second, the claim as construed must be compared to the accused product to ascertain whether it "reads" on the accused product. *Southwall Technologies,*

*Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1575 (Fed.Cir.1995). "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Id.* Where there is no dispute as to any relevant facts regarding the accused product, literal infringement is solely a matter of claim construction. *Athletic Alternatives, Inc.,* 73 F.3d at 1578.

##### 1. Claim Construction [3]

██ It is a court's "power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman,* 52 F.3d at 979. In discharging that obligation a court first consults intrinsic evidence, *i.e.,* the claim language, the written description, and the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). The wording of a patent claim is paramount. *Digital Biometrics, Inc. v. Identix, Inc.,* 149 F.3d 1335, 1344 (Fed.Cir.1998). The written description in a patent directs whether the patentee ascribed a particular meaning to disputed claim terms. *Id.* Absent a special meaning, claim language takes on the ordinary meaning to one skilled in the art. *Id.*

██ "Claims must be read in view of the specification, of which they are a part." *Markman,* 52 F.3d at 979. "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1341 (Fed.Cir. 2001). On the other hand, it is improper

---

**3.** Warner–Lambert argued in its brief that the Court should hold a Markman hearing. At oral argument on the pending summary judg-

ment motions, all parties, including Warner–Lambert, agreed that a separate Markman hearing was not necessary.

to read certain limitations from the patent specification into the claims. *Comark Communications, Inc., v. Harris Corp.,* 156 F.3d 1182, 1186 (Fed.Cir.1998). Examples disclosed in the patent specification may aid in the proper interpretation of a claim but the scope of a claim is not necessarily limited by such examples. *See Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 805 F.2d 1558, 1563 (Fed. Cir.1986) (" 'This court has cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.' "); *see also Northern Telecom Ltd. v. Samsung Electronics Co.,* 215 F.3d 1281 (Fed.Cir.2000).

■ Prosecution history also may shed light on the meaning of a claim, particularly in light of exchanges between the patent applicant and the Patent and Trademark Office. *See Markman,* 52 F.3d at 980.

In *Phillips v. AWH Corp.,* 415 F.3d 1303, 1309 (Fed.Cir.2005) (en banc), the Federal Circuit Court of Appeals recently reaffirmed the aforementioned basic principles of claim construction and discussed the relative importance of intrinsic and extrinsic evidence. Extrinsic evidence consists of expert and inventor testimony, dictionaries, and learned treatises. *Id.* at 1322. The Court of Appeals emphasized that extrinsic evidence is helpful in construing claims, but it is less reliable than intrinsic evidence for four reasons: 1. extrinsic evidence is not created at the time of patent prosecution; 2. extrinsic evidence may not accurately reflect the understanding of one skilled in the field of the patent; 3. expert testimony may suffer from bias on account of being generated for the purpose of litigation; and 4. there is potentially limitless extrinsic evidence of some relevance that might be relied upon for claim construction. *Id.* at 1318–19.

The Court of Appeals also made clear that a court may rely on dictionaries in order to assist in arriving at the commonly understood meaning of a claim, to the extent that the meaning is not at odds with the intrinsic evidence. *Id.* at 1321–22.

Here, the claim construction issue focuses on the claim language "anion of a mineral acid." Purepac urges that the phrase refers to an anion (*e.g.,* chloride ion) from any source that is *capable of* forming a mineral acid, whereas Warner–Lambert counters that it refers only to anions derived *from* a mineral acid, namely, hydrochloric acid. Warner–Lambert maintains that such language limits the amount of residual acid, or HCl, for purposes of controlling lactam formation.

■ The Court adopts Warner–Lambert's claim construction and construes the claim language "anion of a mineral acid" to refer to anions "derived from" a mineral acid. This interpretation is supported by both the intrinsic and the extrinsic evidence.

Turning first to the claim language, the phrase "anion of a mineral acid" arguably supports both parties' constructions. The parties do not dispute the meaning of the terms "anion" and "mineral acid." An "anion" is a negatively charged ion and a "mineral acid" is an inorganic acid, such as hydrochloric acid, sulphuric acid, or nitric acid. The problem is that the claim language "of" does not explain the precise connection between anion and mineral acid. Thus, the phrase could refer to an anion derived from a mineral acid or an anion capable of forming a mineral acid.

The Court believes that Warner–Lambert's construction-that the anions must derive from a mineral acid-makes a better connector with the phrase "a mineral acid." It recognizes that a mineral acid contains an anion and gives full meaning to the phrase in that the anion is identified

according to its mineral acid source.[4] In contrast, defining the anion according to what it is potentially "capable of" forming, as Purepac does, seems strained and unnecessary. Nonetheless, the Court is not prepared to say that the claim language is unambiguous.

Next, the Court turns to the written description of the '482 patent. The written specification does not support Purepac's construction. Purepac basically concedes that point by arguing "the '482 patent's written description offers no aid in discerning the meaning of 'anion of a mineral acid.'" (Purepac Rply. Br. at 10). The question then becomes whether the written specification supports Warner–Lambert's construction.

Purepac argues that the written description, stating that "[t]he proportion of remaining [gabapentin] hydrochloride admixtures should thereby not exceed 20 ppm," ('482 patent, col. 5, ll. 27–29), refers only to keeping the gabapentin hydrochloride admixture below 20 ppm, not to keeping chloride from hydrochloric acid below 20 ppm. Central to this argument is the idea that a "hydrochloride admixture" is entirely different from hydrochloric acid. It follows, according to Purepac, that column 5 includes nothing indicating whether the 20–ppm limit recited in the claims covers only anions derived from mineral acid or all like anions, including anions from both acid and non-acid sources. Warner–Lambert responds that the written description is plainly directed at the need to remove most of the hydrochloric acid from the hydrochloride salt of gabapentin so that the final bulk gabapentin contains less than 20 ppm of this acid (measured as chloride ion).

The Court concludes that the written description, which nowhere defines or uses the phrase "anion of a mineral acid," does not readily aid its claim construction inquiry. The Court thus turns to the prosecution history.

The prosecution history supports construing "anion of a mineral acid" to refer to the amount of mineral acid impurity remaining in the bulk gabapentin. In a December 21, 1993 Declaration, Dr. Herrmann, one of the inventors, reported results of an experiment showing the effect of remaining amounts of hydrochloric acid on stability. (Bartlett Decl., Ex. 3). Dr. Herrmann prepared gabapentin samples according to Warner–Lambert's original gabapentin patent, U.S. Patent No. 4,024,-175 ("the '175 Satzinger patent"). The Satzinger material contained 200 ppm of hydrochloric acid. (Bartlett Decl., Ex. 3 at 5). To determine the stability of the Satzinger material, Dr. Herrmann stored it at room temperature for four months. Based on the observed fifteen-fold increase in the lactam content, he concluded that "[t]his instability can be avoided if specificly [sic] the HCl content is reduced to 20 ppm as disclosed in the present manufacturing process." (Bartlett Decl., Ex. 3 at 4–5).

Following submission of Dr. Herrmann's Declaration to the Patent and Trademark Office, the Examiner noted at an interview that "Applicants will limit all claims [to] 20 ppm of Cl $^\ominus$." (Bartlett Decl., Ex. 4). Warner–Lambert agreed to that change. In a Declaration dated January 25, 1995, Dr. Herrmann described testing done on a gabapentin sample containing 2000 ppm of hydrochloric acid. (Bartlett Decl., Ex. 5 at 8). After reviewing the poor stability results obtained, Dr. Herrmann referred to "[t]he negative effect of small amounts of

---

4. Warner–Lambert's construction also comports with the primary meaning of the preposition "of"-"derived or coming from; origi-nating at or from." The American Heritage Dictionary of the English Language (4th ed.2000).

Gabapentin Hydrochloride in the bulk drug Gabapentin on the stability of this compound." (*Id.*) All agree that gabapentin hydrochloride is immediately formed from the presence of hydrochloride acid in gabapentin.

In December 1999, the applicants stated in another Submission to the Patent Office that (1) the gabapentin must have "a low level of mineral acid as measured by mineral acid anion, *i.e.,* less than 20 parts per million" and (2) that the Food and Drug Administration's gabapentin chloride specification of 100 ppm differed from the inventors' "20 ppm" chloride specification because the "claim limitation is directed to anions derived from acid, while the specification set forth in the NDA for chloride ion is not limited to that derived from mineral acid." (Bartlett Decl., Ex. 6 at 3, 9–10).[5]

That the "less than 20 ppm of an anion of a mineral acid" claim language is limited to anions derived from mineral acid is further supported by test results in the prosecution history indicating that sodium chloride (or table salt), a totally non-acidic source of chloride, has a low propensity to form lactam. (Bartlett Decl., Ex. 7 at 6).

Purepac's arguments concerning the prosecution history do not suggest a different result. Purepac contends that Warner–Lambert represented to the Patent and Trademark Office that chloride levels, not mineral acid, should be kept low because chloride itself adversely affects ga-

bapentin's stability. It does so by highlighting the following points:

- Warner–Lambert contended that the claimed invention differed from the prior art because the prior art failed to "teach or suggest that chloride ion or other mineral acid anions promote lactam formation." (Pros.Hist.000766, 785).[6]

- Referring to the prior art, Warner–Lambert again contended that the "[U.S. Patent No. 4,894,476 ("the '476 Butler patent")] does not teach or suggest that chloride ion, or other mineral acid anions, promote lactam formation." (Pros.Hist.000796).

- Warner–Lambert asserted that "there is no recognition by [the] Butler [patent] of the stability problems concerning gabapentin, or for that matter that chloride ion content plays any role in the production of the desired lactam product." (Pros.Hist.000764, 783).

- Warner–Lambert argued that the "skilled artisan would need to make two independent selections to obtain a stable formulation of gabapentin as disclosed in the present invention." Out of the universe of gabapentin products available, one must choose one with a defined chloride and lactam content. (Pros.Hist.000877).

Also, in a May 1997 amendment, Warner–Lambert cancelled application claim 21 and replaced it with application claim 24, which became patent claim 7. (Pros.Hist.000550,

---

**5.** Purepac contends that this submission has little evidentiary value because it was made with a view toward litigation. The idea is that Warner–Lambert made these statements after it sued Purepac and Apotex for infringing U.S. Patent Nos. 4,894,476 and 5,084,479, and after it had received discovery regarding Purepac's gabapentin products. In addition, Purepac notes that Warner–Lambert's litigation counsel assisted in prosecuting the '482 patent. The Court has nevertheless consid-

ered this submission as part of the prosecution history, and finds it relevant and convincing.

**6.** The Court cites to a bates-numbered version of the '482 patent prosecution history (PC000536–PC000924) attached as Exhibit B to the Declaration of Steven M. Amundson in support of Purepac's Motion.

843–44). In arguing claim 24's patentability, Warner–Lambert urged:

> [T]he present invention involves two specific and interrelated findings. The first was that anions of a mineral acid above 20 ppm promoted lactam formation. The second was that some adjuvants also promote lactam formation. Applicants [Warner–Lambert] submit once these essential findings are disclosed it is a routine matter and simple experimentation to test the adjuvants. However, without the finding and disclosure that *both of these were critical,* the skilled artisan had no motivation to do that testing. In point of fact, if he did it [adjuvant testing] using typical gabapentin active [ingredient] containing *higher levels of an anion of a mineral acid, e.g., higher chloride content,* he would conclude that stability was not achievable.

(Pros.Hist.000845) (emphasis added).

The Court acknowledges that Warner–Lambert made direct references to chloride ion promoting lactam formation. However, Purepac's reliance on those "chloride ion" references ignores the context of the positions taken during prosecution by Warner–Lambert, which is that the chloride ion is a surrogate for mineral acid content. The idea is that if the anion is chloride ion, then it must have come from residual hydrochloric acid. Plainly, Warner–Lambert spoke in terms of chloride because it was a direct measurement of acid. For this reason and those discussed above, the Court is not persuaded that select references to "chloride ions" in the prosecution history are sufficient to defeat Warner–Lambert's claim construction.

Purepac also points out that Warner–Lambert distinguished the claims from prior art based on total chloride content. Warner–Lambert relied on statements by Dr. Wolfgang Hermann, one of the inventors of the '482 patent, in urging patentability over the cited prior art, including the '476 Butler patent and U.S. Patent No. 4,152,326 ("the Hartenstein patent"). For example, with respect to the Hartenstein patent, Dr. Herrmann synthesized gabapentin according to the process disclosed in it. Using silver nitrate titration, Dr. Herrmann tested two samples of that gabapentin for chloride content. Purepac points out that the silver nitrate titration determines a substance's total chloride content. Warner–Lambert urged that "Dr. Herrmann's data evidences the fact that the product prepared according to Hartenstein having a chloride content of 2100 and 2000 ppm is unstable when stored at room temperature in a closed brown glass bottle." Purepac urges that the Hartenstein process includes multiple sources of chloride, including hydrochloric acid and hydroxylamine hydrochloride. In addition, the Hartenstein process produces sodium chloride in making a certain intermediate compound and then attempts to remove the sodium chloride. Using silver nitrate titration, Dr. Herrmann tested that intermediate compound and measured a total chloride content of 1300 ppm. In performing the Hartenstein process and discussing the results, Dr. Herrmann did not differentiate acid-derived chloride ions from other chloride ions. In other words, he treated all chloride ions the same, regardless of the source. From that Purepac argues that Warner–Lambert's claim construction departs from the positions it took before the Patent Office.

Warner–Lambert points to clarifying testimony of its expert, Dr. Bartlett, who reviewed Dr. Herrmann's Declaration concerning the Hartenstein process and stated that gabapentin samples prepared pursuant thereto contained 2000 ppm of residual HCl. (Bartlett Decl. at ¶ 31, Exs. 5, 8; 11/19/04 Tr. at 95–96 (citing 1/31/02

Bartlett Expert Rpt.)). This suggests that HCl was the sole source of chloride in that process. At best, this creates a factual uncertainty as to the source of chloride in the samples made from the Hartenstein process. The Court is not persuaded that this is sufficient to undermine Warner–Lambert's claim construction.

Thus, the Court construes claim 7, clause (i) of the '482 patent to refer to less than 20 ppm of an anion "derived from" a mineral acid. The Court is persuaded that the only logical purpose of the claim limitation, when read in light of the patent and its file history, is to limit the amount of mineral acid impurity remaining in the bulk gabapentin.

2. Comparing Purepac's Proposed Gabapentin Compositions to Construed Claim

Purepac's proposed capsules and tablets have gabapentin with a chloride content between 28 ppm and 100 ppm. Purepac's arguments as to literal noninfringement hinge on its proposed claim construction: Purepac argues that because the total chloride specification in its ANDA (28–100 ppm) forces it to use gabapentin falling outside the claimed range (less than 20 ppm), and because the only products Purepac can produce following FDA approval are the ones that will not literally infringe, its gabapentin products will not literally infringe. *See Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1250 (Fed. Cir.2000) (rejecting argument that a material issue of fact existed as to whether patentee would comply with its ANDA specifications). As noted, the Court has not construed claim 7 to refer to total chlorides, regardless of their source. The relevant claims of the '482 patent, as construed by this Court, cannot be compared to the hydrochloric acid content of Pure-

pac's gabapentin for purposes of a literal infringement analysis because Purepac only seeks summary judgment of literal noninfringement on the basis of total chlorides in its product. On this Motion, Purepac has not argued or established that it is entitled to summary judgment of literal noninfringement based on chloride ions derived from hydrochloric acid.

B. *Doctrine of Equivalents*

■ An accused product that does not literally infringe may nonetheless still infringe under the "doctrine of equivalents," which, subject to certain exceptions, allows a patentee to claim insubstantial alterations not expressly captured in drafting of the original patent claim. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki*, 535 U.S. 722, 733, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002). The underlying rationale of the doctrine is that language may not capture the true essence of an invention. *Id.* at 734, 122 S.Ct. 1831.

The Court understands Purepac to have moved for summary judgment of noninfringement under the doctrine of equivalents based on its total chloride claim construction of claim 7. Having instead construed the claim 7 language "anion of a mineral acid" to refer to chlorides derived from mineral acid, the Court will deny Purepac's Motion for summary judgment of noninfringement under the doctrine of equivalents. Purepac has not met its burden on summary judgment, absent disclosure of the composition of its product in terms of the Court's claim construction.

Accordingly, **IT IS** on this 22nd day of August 2005,

**ORDERED** that the Motion of Defendants Purepac Pharmaceutical Co. and Faulding Inc. for summary judgment of

noninfringement of U.S. Patent No. 6,054,-482 is denied.